## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| KATHLEEN FOSTER, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   **Civil Action No. 15-11841-DJC** |
| | ) |
| CAROLYN COLVIN, Acting Commissioner of | ) |
| the Social Security Administration, | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

---

## MEMORANDUM AND ORDER

**CASPER, J.**                                                          **June 16, 2016**

### I.     Introduction

Plaintiff Kathleen Foster ("Foster") filed a claim for Social Security disability insurance benefits ("SSDI") with the Social Security Administration ("SSA") in July 2010.  R. 137-38.[1] Foster brings this action under 42 U.S.C. § 405(g) for judicial review of the final decision by the SSA Commissioner ("the Commissioner") that denied her claim.  D. 1.  Foster has moved to reverse the decision, D. 15, and the Commissioner has moved to affirm it, D. 17.  For the reasons discussed below, the Court DENIES Foster's motion and ALLOWS the Commissioner's motion.

### II.     Factual Background

In her application for SSDI, Foster alleged that she was unable to work due to multiple physical and mental conditions, including but not limited to multiple hernias, chronic pelvic pain, right leg nerve damage, depression, migraines and hypertension.  R. 165.  Foster previously worked as a car salesperson, retail sales clerk, assistant sales manager, switchboard

---

[1] "R." refers to citations to the administrative record, D. 13.

operator/receptionist and wedding coordinator.  R. 166.  Foster alleged a disability onset date of February 14, 2004, R. 137, and had disability insurance through June 30, 2007, R. 18.

### III.   Procedural Background

Foster applied for SSDI in July 2010.  R. 137-38.  The SSA denied the claim on September 28, 2010.  R. 72-74.  Foster filed a request for reconsideration on December 16, 2010, R. 75, and the SSA upheld the denial on May 11, 2011, R. 77-79.  An administrative law judge ("ALJ") conducted a hearing at Foster's request on June 26, 2012.  R. 16.  In a July 16, 2012 decision, the ALJ ruled that Foster was not disabled under the Social Security Act as of June 30, 2007, Foster's date last insured.  R. 13-25.  Foster requested review of that decision on September 19, 2012, but the Appeals Council denied review, thereby rendering the ALJ's decision final on October 17, 2013.  R. 6-12.

### IV.   Discussion

#### A.   Legal Standards

##### 1.   Entitlement to Disability Benefits

A claimant's entitlement to SSDI depends on whether she has a "disability," defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  The physical or mental impairments must be severe, such that the claimant is unable to perform past work or any other substantial gainful work available in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505.

The Commissioner follows a five-step process to determine whether an individual is disabled.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  First, if the applicant is engaged in

substantial gainful work activity, the application is denied.  20 C.F.R. § 416.920.  Second, if the applicant does not have or has not had within the relevant time period a severe medically determinable impairment or combination of impairments, the application is denied.  Id.  Third, if the impairment meets or equals one of the "listed" impairments in the Social Security regulations, the SSA will find the applicant disabled.  Id.  Before step four, the SSA assesses the applicant's residual functional capacity.  Id.  Fourth, if the applicant's residual functional capacity indicates that she can still perform past relevant work, the application is denied.  Id. Fifth, if the applicant, given her residual functional capacity, education, age and work experience, is unable to do any other work, the application is granted.  Id.

### 2.   Standard of Review

The Court may affirm, modify or reverse the Commissioner's decision upon review of the record.  42 U.S.C. § 405(g).  This review is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Because the Commissioner's role is "to draw factual inferences, make credibility determinations, and resolve conflicts in the evidence, the Court must not perform such tasks in reviewing the record."  Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)).

The Court must accept the Commissioner's factual findings as conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  The Court must adhere to

a finding of fact "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzell, 792 F. Supp. 2d at 148 (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).  If the ALJ, however, made a legal or factual error, "the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard." Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 129 (D. Mass. 2014) (citation and internal quotation mark omitted).

### B.  Before the ALJ

#### 1.  Medical History

##### a.  Physical Impairments

Before the onset date, Foster's surgical history included a laparoscopy, laparoscopic surgery, a pilonidal cyst removal and inguinal hernia repair.  R. 259.

###### i.  Treatment During the Relevant Period

In February 2004, Foster saw Dr. Harold Bass to address complaints of persistent pelvic pain, discomfort, probable adenomyosis and endometriosis.  R. 259-64.  Dr. Bass performed a total abdominal hysterectomy.  R. 264.  In June 2004, Foster visited an emergency room with complaints of sharp chest pains and abdominal pain.  R. 304.  In March 2005, Foster saw Dr. Paul Gilmore for an upper endoscopy with biopsy and was diagnosed with Barrett's esophagus. R. 265.

In May 2006, Dr. Bass performed surgery on Foster to address stress urinary incontinence with cystocele.  R. 268.  Two months later, Dr. Doris Pliskin operated on Foster to repair a right inguinal hernia and recorded a postoperative diagnosis of recurrent right inguinal hernia.  R. 274.  Dr. Pliskin noted that Foster previously had right inguinal hernia surgery in 1988.  Id.  Dr. Pliskin saw Foster for six follow-up appointments between July and December

2006, during which Dr. Pliskin addressed wound drainage, superficial wound infection and "some pain." R. 425-27.

Foster missed three consecutive follow-up appointments from January to April 2007 and did not see Dr. Pliskin again until August 2007. R. 427-28.

ii.   Treatment After the Date Last Insured

In August 2007, Dr. Lawrence Johnson, an orthopedic specialist, wrote to Dr. George Meltsakos, Foster's primary care physician, regarding an evaluation of a year of right-sided hip and back pain. R. 406-07. Dr. Johnson reported that Foster had some gait stiffness, moderately reduced back range of movement, normal spinal alignment, mild discomfort and tenderness, but noted that Foster's pain "[did] not radiate into her legs." R. 406. Dr. Johnson concluded that Foster had chronic back pain with degenerative joint disease. R. 407. The same month, Dr. Pliskin operated on a bulge in Foster's right femoral area. R. 278. Dr. Pliskin recorded a preoperative diagnosis of a right femoral hernia, but discovered during the procedure that Foster had right femoral lymphadenopathy and not a hernia. Id.

In October 2007, Foster saw Dr. Pliskin to address another possible hernia. R. 281. Dr. Pliskin diagnosed and surgically repaired an incisional hernia. R. 283. In June 2008, Dr. Pliskin operated on Foster after a CT scan indicated a right femoral hernia. R. 289. Dr. Pliskin aborted the procedure because there was no femoral hernia present. Id. Dr. Pliskin referred Foster to Dr. Roberto Feliz, who diagnosed Foster with right groin pain consistent with ilioinguinal and genitofemoral neuropathy in July 2008. R. 291. During that visit, Foster reported persistent, severe pain from her right groin through her right knee and complained that actions such as sitting, standing and driving worsened her pain. Id. Dr. Feliz opined that Foster's nerve damage could have resulted from "the previous hernia." R. 292.

Dr. Anthony Dragone appears to have performed right inguinal hernia repair on Foster around August 2008.[2]  In January 2009, Dr. Dragone operated again to repair an abdominal incisional hernia.  R. 332.  Two months later, Foster saw Dr. Dragone for a surgical consult and complained of right hip pain radiating through the leg, but Dr. Dragone found no evidence of an additional hernia and "suggested to the patient that she return to the pain clinic."  R. 337.  Foster returned to Dr. Dragone in April 2009 with similar complaints, but Dr. Dragone reported that the "examination reveal[ed] no evidence of a recurrent right inguinal hernia."  R. 336.  Foster visited Dr. Dragone the next month with identical complaints.  R. 335.  Dr. Dragone found no evidence of a hernia and wrote "I am very reticent to operate."  Id.

In October 2009, Dr. Frank Vittimberga performed right inguinal hernia repair on Foster.  R. 487-88.  Dr. Michael Jiser performed additional hernia repair in March 2010.  R. 585-86.  In December 2010, Dr. Benjamin Henkle began treating Foster for pain management.  R. 647.  Dr. Henkle opined that Foster's pain may have resulted from her extensive surgical history and treated the pain with a right ilioinguinal nerve block and a Vicodin prescription.  Id.  In March 2011, Dr. Henkle administered another nerve block and prescribed Percocet and Tramadol.  R. 889-90.  Two months later, Foster reported that the two nerve blocks were ineffective, so Dr. Henkle recommended the trial use of a spinal cord stimulator and continued the Percocet and Tramadol prescriptions.  R. 892.  In August 2010, Foster reported 100% pain relief during the spinal cord stimulator trial and asked to have one implanted.  R. 895-96.  Dr. Henkle continued the Percocet and Tramadol prescriptions.  R. 895.

---

[2] Dr. Dragone's reports in the record begin on January 12, 2009.  R. 328-41.  In his first operative report on January 15, Dr. Dragone wrote that Foster "has undergone expensive hernia surgeries on the right side culminating of the repair of a hernia that I did approximately five months to repair a recurrent inguinal hernia."  R. 332.  Although this statement is unclear, it suggests that Dr. Dragone performed inguinal hernia repair on Foster around August 2008.  This conclusion is consistent with a March 29, 2009 pain clinic report by Dr. Meltsakos indicating that Foster was "status post hernia repair x 2 with Dr. Dragone."  R. 370.

In September 2011, Foster had a stimulator surgically implanted.  R. 905.  Later that month, Dr. Henkle reported that the stimulator provided "excellent pain coverage" and that he planned to gradually reduce Foster's pain medications.  R. 903.  In October 2011, Foster reported that her leg pain improved and that she could comfortably walk up stairs.  R. 907.  Dr. Henkle prescribed Percocet after Foster asked for pain medications to get her through an eight-day vacation to Florida.  Id.  A month later, Dr. Henkle stopped Foster's Percocet prescription and prescribed Tramadol for sparing use because of Foster's reported success with the spinal cord stimulator.  R. 909.

 In December 2011, Foster reported that her right side pain "immensely" improved, but also complained of left leg pain. R. 911.  Foster requested opioids for daytime use and told Dr. Henkle "you can trust me."  Id.  Dr. Henkle noted his "suspicion for drug-seeking behaviors," but prescribed Foster Percocet and OxyContin.  Id.

In January 2012, Foster reported that the OxyContin made her feel "high" and instead took Percocet until it ran out.  R. 915.  Dr. Henkle asked Foster to return the unused OxyContin to be destroyed, but Foster replied that she discarded the unused pills and asked for other higher dose opioids.  R. 915-16.  Dr. Henkle documented his suspicion of drug-seeking behavior and resolved to increase the frequency of urine drug screens.  Id.  Dr. Henkle noted that Foster's urine drug screen "showed only [Benzodiazepine] which was expected."  R. 916.  Dr. Henkle prescribed Percocet and Tramadol.  R. 915.

In March 2011, Foster reported a left knee injury, complained of left leg pain and requested more opioids.  R. 917.  Dr. Henkle noted his suspicions, but prescribed Percocet and Tramadol.  Id.  In April 2011, the date of Dr. Henkle's last available progress note, Foster reported left leg pain.  R. 921.  When Dr. Henkle ordered a drug screen, Foster told Dr. Henkle

that the test would only show Valium and Xanax because she was grieving.  R. 922.  Foster told

Dr. Henkle that she had not taken opioids for "maybe a week" causing Dr. Henkle to become

"VERY suspicious for diversion."  Id. (emphasis in original).  Dr. Henkle wrote "[i]f this screen

shows no opioids, or includes any other non-prescribed drugs of abuse, she will not get any more

controlled meds and will likely be discharged."  Id.

b.   Mental Impairments

i.   Treatment Before the Onset Date

In April 2002, Dr. Neelam Sihag conducted a psychiatric evaluation of Foster.  R. 246-

49.  Dr. Sihag noted that Foster received psychiatric care for two and a half years before the

examination, and before that, Foster's primary care physician prescribed her medications for

mental impairments.  R. 246.  Foster reported having heart palpitations, paranoid thoughts and

relationship problems, as well as feelings of dizziness, depression and loneliness.  R. 246-47.

Dr. Sihag also found that Foster "appeared depressed and anxious."  R. 248.  Dr. Sihag

concluded the evaluation with a reference to "major depress[ion]," R. 248, although it is unclear

whether this represents a diagnosis.  Dr. Sihag planned to continue Foster's medications, then

altered her prescription that May.  R. 249.

ii.   Treatment During the Relevant Period

In October 2005, Dr. Sihag wrote that Foster was "still busy [with] her work" and had

"many singing engagements in [the] next few months."  R. 258.  Dr. Sihag noted that Foster

appeared to have lost weight and seemed to be doing well.  Id.  A month later, Foster reported

relationship problems and tense feelings ahead of the upcoming holidays.  Id.  In December

2005, Dr. Sihag wrote that Foster lost weight and was "getting a lot of work for party singing

[and] making extra money," and that "this way she does not feel she is dependent on her husband."  R. 257.

In January 2006, Foster reported doing "very good" despite relationship problems.  Id. Dr. Sihag noted that Foster was "busy [with] her singing business" in February.  R. 256.  In March 2006, Dr. Sihag reported that Foster was exercising, "keeping busy [with] her music business" and "overall doing well."  R. 255.  A month later, Foster stated that she was exercising and felt irritable and lonely.  Id.

In May 2006, Dr. Sihag reported that Foster felt the upcoming summer would "be even better businesswise" and that Foster was coping with stressors.  R. 254.  That June, Dr. Sihag wrote that Foster's "music business [was] going slow this year" so she was "looking into other options," and that Foster stayed active.  Id.  Foster reported feeling depressed in August, 2006 but was "doing somewhat better [and] coping with stressors better" a month later.  Id.  In October 2006, Dr. Sihag wrote that Foster's "music business is again picking up" and that Foster "has been busy with her work."  R. 252.  In November 2006, Foster reported "not feeling as stressed."  R. 252.

In January 2007, Dr. Sihag reported that Foster was under a lot of stress.  R. 251.  A month later, Dr. Sihag wrote that Foster's husband was in the process of "taking another job" and that Foster's "music business [was] going well."  R. 250.  Foster reported that a switch to generic medication made her feel more depressed and caused a lack of motivation.  Id.

### iii.  Treatment After the Date Last Insured

Dr. Jeffrey Speller treated Foster from August 2007 through at least May 2012.[3]   Dr. Speller diagnosed Foster with dysthymic disorder, generalized anxiety and mood disorder.  R.

---

[3] Dr. Speller's notes contained in the record range from August 15, 2007 to May 25, 2012.  R. 679-718, 926-27. Many of Dr. Speller's notes are illegible.  See R. 48-50, 682-91.  This summary thus relies upon the following

679, 692, 700.  Dr. Speller described Foster's mental status as depressed, anxious and irritable, and characterized Foster's prognosis as "fair to poor." R. 679-80.

In September 2010, Dr. Speller found Foster "to be totally disabled and not able to work." R. 704.  In a May 2012 letter to Foster's counsel, Dr. Speller reported that Foster suffered from severe depression, severe anxiety and significant mood swings that affected Foster's concentration, memory, work skills, ability to follow directions and ability to work in a team environment.  R. 924.  He also opined that Foster could no longer perform her past work or any other substantial gainful work.  Id.

### 2. SSA Records

In August 2010, Foster submitted an adult function report to the SSA.  R. 178-85.  Foster reported that her average day consisted of having coffee and doing whatever activities her leg and abdominal pain would permit.  R. 178.  Her ailments limited her walking distance to a quarter mile, prevented her from standing or sitting for more than brief periods and prohibited lifting more than five pounds.  R. 179, 183.  Foster had difficulty sleeping because of extreme leg pain and constant lower abdominal pain.  R. 179.  She had difficulty dressing and bathing, and could only prepare meals that did not involve lifting or bending.  R. 179-80.  Foster did not follow written or spoken instructions well and had difficulty handling stress or changes in her routine.  R. 183-83.

Foster completed a second function report in February 2011.  R. 192-202.  She described her daily activities to include making coffee and breakfast, cleaning the house until she had to sit down, driving to medical appointments, reading and watching television, and noted that she had to sit after short periods of physical exertion.  R. 192, 200.  Foster could no longer lift, walk up

---

documents signed by Dr. Speller:  a letter to Foster's counsel on May 27, 2012, R. 924-25, an evaluation prepared for the SSA on April 28, 2011, R. 679-81, and typed notes covering October 29, 2009 through April 28, 2011, R. 692-716.

stairs, vacuum or bend because of her ailments.  R. 194.  She needed reminders to take care of

personal needs and grooming and engaged in only light house work because of her pain.  R. 195.

Foster reported that she could read, watch television, listen to music and visit with friends

regularly, as long as she did not sit for extended periods.  R. 197.  Foster reported being able to

lift up to seven pounds and walk a half mile.  R. 198.  She could follow written and spoken

instructions "fine" and could handle stress and changes in routine.  Id.

### 3. SSA Medical Assessments

In September 2010, Dr. Marcia Lipski, a state agency consultant, conducted a case

analysis of Foster's record and considered Foster's history of chronic pelvic pain, hysterectomy,

hernia surgeries and other procedures.  R. 646.  Dr. Lipski concluded that Foster's physical

impairments were not severe during the relevant period.  Id.  In May 2011, state agency

consultant Dr. Beth Schaff affirmed Dr. Lipski's assessment "as written."  R. 666.

Also in September 2010, state agency consultant Dr. Arlene Reed-Delaney conducted a

psychiatric review technique.  R. 632-44.  Dr. Reed-Delaney determined that Foster's depression

caused mild difficulties in maintaining social function but did not restrict daily activities or

concentration.  R. 642.  Dr. Reed-Delaney noted that there was no evidence of significant

limitations in Foster's functioning and concluded that Foster's impairment was not severe.  R.

644.  In May 2011, Dr. Edwin Davidson, also a state agency consultant, reaffirmed that Foster's

impairment was "not severe."  R. 667.

### 4. June 16, 2012 ALJ Hearing

Foster testified that she last worked in 2004, both full-time as a receptionist or

switchboard operator and part-time as a wedding coordinator.  R. 38.  She previously worked as

a retail sales clerk and assistant manager.  Id.  The ALJ questioned Foster about psychiatric

treatment records indicating that Foster had "many singing engagements" in 2005 and "a music business that was going well" in 2007, but Foster denied having any singing engagements or running a music business during the relevant period.  R. 39-41.  Foster testified that she stopped working because of chronic right side pain and complications from a hysterectomy.  R. 41-42.

Foster testified that her pain and nerve damage stemmed from her first hernia surgery and that her right leg pain followed her "second or third operation."  R. 53-54.  Foster also stated that her first hernia surgery contributed to depression and anxiety, which affected her ability to think clearly and to perform tasks.  R. 51-52.  Foster testified that she intended to return to work after her 2004 surgery, but her mental and physical impairments prevented her from doing so.  R. 53.

Foster claimed that she could not return to work because of right leg pain and numbness, difficulty concentrating, poor memory, inability to sleep, difficulty managing chronic pain and the need to take frequent breaks.  R. 54-56.  Foster also stated that "[e]very six months, [she] would get a right inguinal hernia."  R. 42.

The ALJ questioned Foster about her most recent primary care physician.  R. 56.  Foster testified that this doctor suspected her of selling her pain medications and later discharged her as a patient after two drug screens revealed the absence of prescribed opioids in her system.  R. 56-57.  Foster denied selling her medications and explained that she stopped taking them to maintain sound judgment while acting as a "proxy" for a close friend dying of cancer.  R. 57-60.  Foster estimated that she stopped taking opioids around February or March 2012.  R. 60-61.

The vocational expert testified that Foster, who was 53 at the time of the hearing, was approaching advanced age and had a twelfth-grade education.  R. 65. Regan classified Foster's previous employment as follows:  car sales (light duty and semi-skilled); sales clerk (light duty

and semi-skilled); receptionist and switchboard operator (sedentary and semi-skilled); and wedding coordinator (light duty and skilled).  R. 65-66.

Foster responded to these classifications and stated that the receptionist and wedding coordinator positions involved lifting heavy boxes and that wedding coordinator position required "a lot of running around."  R. 67.  The ALJ asked Foster to estimate the weight of these boxes, but Foster declined because she felt she was not good at estimating.  R. 67-68.

### 5.  The ALJ's Findings

Following the five-step process outlined in 20 C.F.R. § 416.920, at step one, the ALJ found that Foster did not engage in substantial gainful activity during the relevant period of February 14, 2004 and June 30, 2007.  R. 18.

At step two, the ALJ found that Foster had the following severe impairments:  "Lumbar Degenerative Disc Disease; Status Post Right Inguinal and Femoral Hernia Repair."  Id.  The ALJ found that Foster's 2004 hysterectomy and 2006 bladder repair surgery did not constitute severe impairments because follow-up examinations did not indicate complications from either procedure.  Id.  Foster's nerve damage did not amount to severe impairment because the symptoms did not begin until 2009.  Id.  The ALJ found Foster's depression to be a non-severe impairment because it caused mild symptoms without any episodes of decompensation.  R. 19-20.  The ALJ also found that Foster's chest pain, gastroesophageal reflux disease, Barrett's esophagus, hyperlipidemia and high blood pressure were also not severe because the record did not indicate that Foster suffered more than minimal limitations during the relevant period.  R. 19.

At step three, the ALJ determined that through Foster's date last insured of June 30, 2007, Foster did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security regulations.  R. 20.

At step four, the ALJ found that Foster had the residual functional capacity to perform the full range of light work as of the date last insured.  R. 20.  Although the ALJ found that Foster's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," the ALJ concluded that Foster's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible when evaluated in accordance with Social Security Regulations."  R. 21.  Concerning Foster's severe impairments during the relevant period, the ALJ found that Foster had two documented hernia surgeries in June 2006 and October 2007, and suffered "minimal functional limitations" as a result of those surgeries before the date last insured.  R. 21-22.  In concluding that the record did not reveal objective symptoms resulting from hernias that would prohibit light work, the ALJ referenced a "normal" physical examination and evidence that Foster exercised and tried to lose weight during that period.  R. 21-22.  Similarly, the ALJ concluded that Foster's degenerative disc disease did not limit Foster's ability to perform light work, in part because of an August 2007 examination revealing "good hip range of motion, no leg swelling, and [no] apparent symptoms in her lower extremities," accompanied by moderately reduced range of back motion, gait stiffness and mild discomfort.  D. 22.  Because the record indicated that Foster worked during the relevant period and because Foster's physician suspected her of selling her pain medications, the ALJ found Foster's subjective complaints of severe physical limitations and pain not to be credible.  R. 22-23.

At step five, the ALJ found that Foster was capable of performing past relevant work as a receptionist or switchboard operator as of the date last insured.  R. 23.  Considering Foster's age, education and work experience, the ALJ concluded that Foster was not disabled during the relevant period.  R. 24.

### C.      Foster's Challenges to the ALJ's Findings

*1. Substantial Evidence Supports the ALJ's Credibility Determination*

Foster argues that the ALJ improperly assessed the credibility of Foster's own statements about her pain and other limiting symptoms in three ways:  (1) by erroneously concluding that Foster worked as a singer during the relevant period; (2) by crediting Dr. Henkle's suspicions that Foster diverted her pain medications; and (3) by ignoring evidence corroborating Foster's claims. D. 16 at 5-7.  None of these arguments are meritorious.

An ALJ "is not required to take the claimant's assertions of pain at face value." Botelho v. Colvin, No. 15-cv-11778-MPK, 2015 WL 9272854, at *8 (D. Mass. Dec. 18, 2015) (quoting Bianchi v. Sec'y of Health & Human Servs., 764 F.2d 44, 45 (1st Cir. 1985)).  Instead, an ALJ is "entitled to disbelieve subjective complaints of disabling pain in the face of contrary medical evidence." Tetreault v. Astrue, 865 F. Supp. 2d 116, 126 (D. Mass. 2012).  "The credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

First, Foster contends that the ALJ improperly used evidence of a singing business to discredit Foster's statements.  D. 16 at 5.  She asserts that "the business that [Foster] was referring to was her husband's business" and that "there are no other statements or other evidence of any kind to indicate that the plaintiff was working during this time."  D. 16 at 5. Foster further argues that the ALJ's step 1 determination that Foster did not engage in substantial gainful activity was inconsistent with a conclusion that Foster operated a singing business.  Id.

Substantial evidence, however, supports the ALJ's conclusion that Foster's singing work undermined her credibility.  R. 22.  Dr. Sihag repeatedly referenced Foster's singing business and twice described that business as independent from Foster's husband's work, suggesting that Foster worked during the relevant period.  Dr. Sihag's treatment notes mention Foster's singing business numerous times between October 2005 and February 2007, all within the relevant period.  R. 250-58.  In December 2005, Dr. Sihag wrote that Foster was "getting a lot of work for party singing [and] making extra money" and that "this way she does not feel she is dependent on her husband."  R. 258.  In February 2007, Dr. Sihag noted that Foster's husband was in the process of changing jobs at a time when Foster's "music business [was] going well."  R. 250.  A reasonable factfinder viewing the evidence could conclude that Foster's ability to work undermined her claims that she suffered disabling impairments during the relevant period.  See Dwyer v. Astrue, No. 11-cv-12048-JGD, 2013 WL 3965398, at *10 (D. Mass. July 31, 2013) (upholding an ALJ's adverse credibility finding based in part on the claimant's part-time employment).  The ALJ was entitled to draw this conclusion despite finding that Foster did not engage in substantial gainful activity during the relevant period because her singing business appears to have been part-time.  See McDonald v. Astrue, No. 10-cv-10896-DPW, 2011 WL 3562933, at *12 (D. Mass. Aug. 15, 2011) (noting "[t]hat the ALJ found that McDonald had no substantial gainful employment as of December 31, 1986, is not inconsistent with his finding that McDonald worked occasionally as a self-employed construction worker").

Second, Foster argues that the ALJ based the credibility determination in part on "the erroneous opinion of Dr. Henkle" that Foster misused her opioid prescriptions.  D.16 at 6.  But "[a]n ALJ is entitled to view such drug-seeking behavior as undermining a claimant's complaints of pain."  Nichols v. Astrue, No. 10-cv-11641-DPW, 2012 WL 474145, at *10 (D. Mass. Feb.

13, 2012).  Although Foster denies selling her pain medications and cites her work history, her lack of a criminal record, her friend's death and her marital status to refute the accusation, D. 16 at 5-6, the Court must adhere to findings supported by substantial evidence even if the record arguably justifies a different conclusion.  Whitzell, 792 F. Supp. 2d at 148.  Dr. Henkle's treatment notes indicate that he suspected drug-seeking behavior from December 2011 to April 2012.  R. 911-12, 915-18, 921-22.  When Foster declined to return unused OxyContin because she allegedly discarded the pills, Dr. Henkle's suspicions led him to require more frequent drug screens for Foster.  D. 915, 917, 921.  Just before the April drug screen, Foster told Dr. Henkle that she had not taken Tramadol or Percocet in a week, leaving Dr. Henkle "VERY suspicious for [drug] diversion."  R. 922 (emphasis in original).  The ALJ noted that Foster claimed to have stopped taking the medications from February to March 2012, but the January drug screen also showed no opioids in her system.  R. 23; see R. 60-61, 916.  After a second drug screen revealed the complete absence of opioids, Dr. Henkle chose to discontinue treating Foster despite her explanations.  R. 916, 921.  In light of objective evidence that Foster's primary care physician believed so strongly that Foster was selling her pain medications that he discharged her as a patient, substantial evidence supports the ALJ's adverse credibility determination.

Finally, Foster argues that the ALJ's credibility determination ignored factors such as her work history, extensive medical treatment before and after the relevant period, consistent statements about her pain, the absence of other benefits claims and her delay in filing for SSDI. D. 16 at 6.  An ALJ, however, is not required to discuss every piece of relevant evidence provided that her conclusion is supported by substantial evidence.  Dube v. Astrue, 781 F. Supp. 2d 27, 35 n.11 (D.N.H. 2011).

Here, the ALJ concluded that Foster's "statements concerning the intensity, persistence and limiting effects of these symptoms were not credible when evaluated in accordance with Social Security Regulations." R. 21. First, the ALJ found Foster's complaints of hernias "every three to six months" not credible because the record indicated only two documented hernias during the relevant period and the ALJ concluded that a normal physical examination in October 2007 and evidence of regular exercise refuted Foster's complaints of debilitating pain.[4] R. 21-22. Second, the ALJ concluded that Foster's back pain did not limit her beyond light work because an August 2007 examination indicated only mild impairments. R. 22. Third, the ALJ found evidence in psychiatric treatment notes that Foster operated a singing business to refute the credibility of her claims that she could not work during the relevant period. Id. Finally, the ALJ determined that Dr. Henkle's decision to discharge Foster as a patient because he suspected her of selling pain medications instead of using them weakened the Foster's claims that she endured disabling pain. R. 23. Considering the full record, the ALJ sufficiently addressed Foster's subjective complaints of limiting symptoms and provided specific reasons for discrediting them, and was thus entitled to render an adverse credibility determination. See Correia-Pires v. Astrue, No. 10-cv-10724-DPW, 2011 WL 3294903, at *7 (D. Mass. July 29, 2011) (concluding that the ALJ's decision to give little weight to the plaintiff's subjective complaints was supported by substantial evidence and noting that an ALJ's decision must contain "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight") (citation omitted).

---

[4] The Court notes that Foster had at least several hernia operations after the date last insured. R. 283, 332, 487, 585. The ALJ's adverse credibility finding, however, is supported by substantial evidence as explained in reference to the record in the decision that refute Foster's claims of debilitating pain. R. 21-23.

2. *Substantial Evidence Supports the ALJ's Finding that Foster's Other Impairments Were Not Disabling*

Foster also asserts that the ALJ's decision was not supported by substantial evidence, but does not challenge any specific findings. D. 16 at 4. The Court, however, concludes that the ALJ's findings that Foster was not disabled were based on substantial evidence.

First, the ALJ found that Foster's conditions following her hysterectomy and bladder repair were not severe because those impairments did not last for the required 12-month duration. R. 19. Foster's hysterectomy took place in February 2004 and the record does not contain evidence of any follow-up examinations related to the hysterectomy. R. 259-64. Foster first complained of stress incontinence in January 2006, had surgery that May and did not report incontinence problems past June 2006. R. 266-71, 415. Substantial evidence, therefore, supports the ALJ's findings that Foster was not severely impaired by the hysterectomy or urinary incontinence during the requisite period.

Second, the ALJ gave Foster "the benefit of the doubt" that she had some nerve damage resulting from surgeries prior to the date last insured, but concluded that the impairment was not severe because it "did not cause any significant symptoms during the period of disability at issue." R. 19. In July 2008, Dr. Feliz opined that Foster's persistent, severe pain could stem from nerve damage as a result from "the previous hernia." R. 292. Between the date last insured and Dr. Feliz's assessment, Foster had three additional surgeries: to repair a hernia that turned out to be right femoral lymphadenopathy in August 2007, R. 278; to repair an incisional hernia in October 2007, R. 281; and to address a femoral hernia ultimately determined not to exist in June 2008, R. 289. Because the record does not indicate nerve damage symptoms until Foster underwent three additional surgeries after her date last insured of June 30, 2007, the ALJ

reasonably concluded that Foster's nerve damage limitations were not severe before her disability insured status expired.

Third, the ALJ found that Foster's chest pain, gastroesophageal reflux disease, Barrett's esophagus, hyperlipidemia and high blood pressure were also not severe because the record did not indicate that Foster suffered more than minimal limitations during the relevant period.  R. 19.  Foster does not appear to challenge this finding and Foster's medical records do not reveal complaints of severe impairments due to these conditions.  See R. 265, 280, 412-21.

Finally, the ALJ found that Foster's depression during the relevant period was non-severe and thus not disabling.  R. 19-20.  When assessing a claimant's alleged mental impairments, the ALJ must rate the claimant's degree of functional ability through factors including the mental impairment's effect on activities of daily living, social functioning, concentration, persistence, pace and whether the impairment causes episodes of decompensation.  20 C.F.R. § 404.1520a(d).  Here, the ALJ found that Foster's depression did not restrict her daily activities or social functioning, and did not cause any extended episodes of decompensation.  R. 19-20.   The ALJ also concluded that Foster's depression mildly affected her concentration, persistence and pace.  R. 19.  The ALJ based this opinion primarily on Dr. Sihag's treatment records from April 2002 through January 2007, which reveal that Foster endured depression, anxiety, marital problems and stress.  R. 246-58.   Dr. Sihag's notes do not indicate that Foster's depression severely affected her daily or social functioning.  Id.  Consistent with the ALJ's conclusion, these records suggest limited impairment that was well-controlled by medication.  Id.  Because a reasonable mind viewing Foster's mental health records could accept the ALJ's conclusion that Foster's mental impairments were not severe, the ALJ's finding is supported by substantial evidence.[5]

---

[5] The ALJ gave little weight to Dr. Speller's opinion that Foster's mental impairments prohibited employment.  R. 20.  The ALJ noted that Foster first saw Dr. Speller after the relevant period and that "even Dr. [Speller] stated that

Foster also argues that "it is reversible error for the ALJ to ignore portions of the record that would tend to provide proof of [Foster's] limitations because they occurred after the time period at issue, while simultaneously relying on that same evidence to cast doubt on [Foster's] credibility." D. 16 at 4. Foster, however, "is not entitled to disability benefits unless [she] can demonstrate that [her] disability existed prior to the expiration of [her] insured status." Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986) (affirming a decision to deny SSDI when the claimant's alleged disability occurred nearly two years after disability insured status had expired). Because Foster must demonstrate that she had a severe disability before June 30, 2007, her extensive medical treatment after that date cannot establish disability. Credibility determinations, moreover, "require[] an ALJ to consider a claimant's statements in light of the entire record." Bourinot v. Colvin, 95 F. Supp. 3d 161, 180 (D. Mass. 2015). It was thus appropriate for the ALJ to consider evidence like Dr. Henkle's records from December 2010 to April 2012 when rendering a credibility determination.

## V.      Conclusion

For the above reasons, the Commissioner's motion to affirm, D. 17, is ALLOWED and Foster's motion to reverse, D. 15, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[Foster's] illness began after the date last insured." Id. In a 2011 report prepared for the SSA, Dr. Speller noted that he first treated Foster on August 15, 2007 and wrote in that same date for "[d]ate of first signs of illness." R. 660. Dr. Speller may have indicated that Foster's symptoms appeared on that day because he could not provide an opinion about Foster's condition before their first meeting. In any case, substantial evidence supports the ALJ's finding because it was based upon extensive treatment records from the relevant period and opinions from state agency consultants. R. 19-20.